55-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1129 | **DATE** | 5/28/2003 |
| **CASE TITLE** | | Hudson v. City of Chicago | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Defendant's Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, the Defendant's Motions for Summary Judgment [20-1] [38-1] are GRANTED in their entirety. This case is closed.

(11) ■ [For further detail see attached memorandum opinion and order.]

| | | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | MAY 2 9 2003 | | 47 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| mds(lc) | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM HUDSON and BISHOP PAMON, | ) ) ) | |
| | ) | No. 02 C 1129 |
| Plaintiffs, | ) | |
| | ) | HONORABLE DAVID H. COAR |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs William Hudson ("Hudson") and Bishop Pamon ("Pamon") (collectively "Plaintiffs") are former police officers who are suing their former employer, the City of Chicago ("Defendant" or "the City"), pursuant to 42 U.S.C. § 1983 for terminating them from their employment in violation of their due process rights. Before this Court are the City's motions for summary judgment against both Plaintiffs. For the following reasons, the Court GRANTS the City's motions for summary judgment in their entirety.

### I. Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); see also Schmidt v. Ottawa Medical Center, P.C., 322 F.3d 461, 463 (7th Cir. 2003). When evaluating a motion for summary judgment, the Court

views the evidence in the light most favorable to the non-moving party and makes all reasonable

inferences in his favor. See Rogers v. City of Chicago, 320 F.3d 748, 750 (7th Cir. 2003).

It is the moving party's burden to demonstrate the absence of genuine issues of material

fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel.

Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving

party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule

56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the

non-moving party cannot rest on the pleadings alone, but must designate specific facts in

affidavits, depositions, answers to interrogatories or admissions that establish that there is a

genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

## II. Background

Unless otherwise stated, the following facts are undisputed and are taken from the parties'

Local Rule 56.1 materials. Hudson and Pamon are former employees of the Chicago Police

Department. Defendant is a municipal corporation organized under the laws of the State of

Illinois, and the Chicago Police Department (CPD) is an operating department of the City.

### Applicable Ordinances, Agreements, and CPD Policies/Regulations

Illinois Law

Section 10-1-18.1 of the Illinois Municipal Code, which the City adopted pursuant to its

home rule powers, see Chicago Municipal Code § 2-84-030 (1990), provides that:

> In any municipality of more than 500,000 population, no officer or employee of
> the police department in the classified civil service of the municipality whose
> appointment has become complete may be removed or discharged, or suspended
> for more than 30 days, except for cause upon written charges and after an
> opportunity to be heard in his own defense by the Police Board . . . Upon filing of

charges for which removal or discharge, or suspension of more than 30 days is recommended a hearing before the police board shall be held . . . .

65 ILCS 5/10-1-18.1.

Section 10-2.1-17 further provides that:

[N]o officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense . . . The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof . . . In the conduct of this hearing, each member of the board shall have the power to administer oaths and affirmations, and the board shall have the power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to the hearing.

65 ILCS 5/10-2.1-17.

*Chicago Police Department Policy*

The CPD requires that its sworn police officers carry firearms to fulfill their police obligations. When a sworn member of the CPD is prohibited from carrying a firearm by legislative or judicial action, that member is ineligible to work in any assignment or to be paid. An officer subject to such action may use his accrued personal time to continue to be paid. Personal time includes furlough days, baby furlough days, and compensatory time. After an officer exhausts his paid personal time, he is required to continue to account for his absence from work. The officer may do so by applying for and obtaining an unpaid leave of absence. Alternatively, the officer may notify his district of his status each day he is required to work. An officer on an approved unpaid leave of absence is not required to call the CPD during the pendency of his leave. In certain limited circumstances, the CPD will strip a police officer of his authority to carry a firearm or otherwise exercise his police powers. In these cases, CPD policy

may in some, but not all, cases allow the officer to remain in a paid status. Such officers would

be placed in a less sensitive position within the CPD pending the outcome of an investigation.

*The Collective Bargaining Agreement*

At all relevant times, the employment relationship of police officers was governed by a

collective bargaining agreement entitled "Agreement Between the City of Chicago and The

Fraternal Order of Police Lodge No. 7" ("CBA"). Under Article 23, Section 23.1(D) of the

CBA, the employment relationship between a police officer and the CPD is terminated if the

officer is absent without notice ("AWOP") for four consecutive days. The CBA does not

afford the officer a hearing to contest this termination. This policy has been adopted by the

CPD as General Order 94-5-1A(V). The CPD considers terminations under this policy to

constitute job abandonment.[1]

Usually, the CPD becomes aware that an officer is AWOP from the unit that the officer

is assigned. The unit is instructed to make out a Personnel Action Request ("PAR form") for

each day that the officer is absent. On the fourth consecutive day, a Final PAR form is

prepared, and all the forms are forwarded to the Personnel Division. Once Personnel receives

all of the PAR forms, an administrative sergeant verifies that there was a four-day AWOP by

calling the officer's unit. The Commander of Personnel would then sign off on the final PAR

form, thus executing the officer's termination. This entails notifying the CPD's Finance

---

[1] According to the City, while the CBA does not on its face provide for an opportunity
to be heard, in practice, the CPD allows an officer to be heard on that officer's AWOP
termination before a final decision is made. Plaintiffs dispute that is the practice and point to
Gawne's and Powers' testimony that, in their experience, they are not aware of any officer
who was AWOP for four consecutive days and not terminated as a result.

Division and the City Department of Personnel that, as of a certain date, the officer no longer is employed with the CPD. Shortly thereafter, the officer would be notified by mail that he or she is terminated.

The CBA contains a grievance procedure for police officers. Under the CBA, a "grievance" is defined as "a dispute or difference between the parties to this Agreement concerning interpretation and/or application of this Agreement or its provisions." An officer may initiate a grievance on his own or through the Fraternal Order of Police Lodge No. 7 ("the Union").[2] The officer must submit his grievance to his immediate supervisor in his unit of assignment within seven working days of the event giving rise to the grievance or seven days following the officer's first knowledge of the events leading to the grievance. Within seven working days of the receipt of the member's grievance, the supervisor is required to respond to the grievance and then immediately present the grievance to the commanding officer of the aggrieved officer's unit. The commanding officer is then required to render a decision in writing within 14 days of receiving the grievance. If the aggrieved officer is not satisfied with the decision of his commanding officer, then the officer and the Union may request mediation.

---

[2] Plaintiffs dispute what "initiate" means in this context. Plaintiffs contend that, if an officer member of the Union files a grievance under Article 9 of the CBA, the Union's Grievance Chair reviews the grievance with the union counsel. The Grievance Chair, in conjunction with the Union's General Counsel, decides whether to proceed with the grievance or withdraw it. If the Union decides against pursuing the grievance, the officer may appeal that decision within the Union; the officer cannot, however, pursue the grievance on his own if the Union denies his appeal. Defendant disputes that the CBA mandates this procedure.

Grievances that are not resolved by these means may be submitted to arbitration by the union. At the arbitration hearing, officers (through their unions) are entitled to the following procedural protections:

a. The right to select the arbitrator with the mutual agreement of the City or the right to select by process of elimination (with each side eliminating one name in turns) an arbitrator from a list of seven qualified neutral arbitrators selected by the American Arbitration Association.

b. The right to be represented by counsel.

c. The right to present witnesses on his behalf.

d. The right to a written decision by the arbitrator within 30 days following the close of the hearing. That decision must be based on the Arbitrator's interpretation of the meaning of the CBA or the application of the CBA to the facts of the grievance.

Neither Hudson nor Pamon filed a grievance under the CBA seeking an interpretation of its provisions regarding their discharges for being AWOP. Both, however, contend that they were told by the Union that they could not file a grievance.

### Hudson's Work History as a Chicago Police Officer

The City hired Hudson on August 7, 1995 as a probationary police officer. After training, Hudson was assigned to the 3rd District of the CPD. He remained at the 3rd District until the beginning of 1999, when he was transferred to the 18th District of the CPD. At the time of his termination from the CPD, Hudson was working at the 18th District.

On or about October 3, 2000, Hudson allegedly was involved in a domestic violence incident at 8339 S. Martin Luther King Drive in the 6th District of the CPD. After this incident,

-6-

Sergeant Raymond Okonski at the 6th District took Hudson's weapon and other accouterments of his office. Hudson was then placed on leave with pay pending investigation. Hudson does not claim that this incident is related to the violations of due process alleged in this lawsuit. Hudson did not return to work at any time after this incident.

On January 26, 2001, Hudson was arrested for domestic battery and released on a $3000 "D" bond. As a condition of that bond, Hudson was not allowed to use or possess any firearms. The condition of bond remained in effect until June 18, 2001, when Hudson was found not guilty of the charge after a bench trial. After Hudson's arrest, he met with Sergeant Raymond Gawne ("Gawne") at CPD Personnel Section. Gawne met with Hudson about his bond restriction and to inform him that his police powers were suspended. Gawne informed Hudson that he was being placed on a no-pay status and that he had the option of continuing to be paid by using his accumulated vacation, furlough, baby furlough, personal days, and compensatory time ("personal time") until it was exhausted. Gawne also told Hudson that he needed to call his district every day to inform them or inquire about the time he would be using. Gawne then asked Hudson to sign an acknowledgment that he was aware that he could not exercise his police powers or be in a paid status while subject to a judicial restriction from using a firearm. Plaintiff signed the acknowledgment. After meeting with Gawne, Hudson proceeded to exhaust his personal time while his criminal case was pending.

**Hudson's Termination**

On March 18, 2001, Hudson exhausted all his personal time. On or about that date, Hudson called his district timekeeper who informed him that his personal time was exhausted. Hudson asked his timekeeper and his watch commander what steps he should take next. The

-7-

watch commander referred Hudson to his district commander. Hudson contacted his district commander's office but did not speak to the commander. He eventually reached the district commander's secretary and scheduled a meeting with the district commander.

Hudson never applied for an unpaid leave of absence and he did not show up for work on March 19, 20, 21, and 23. On or about March 22, 2001, Gawne sent Hudson a letter advising him that his employment was being terminated for unauthorized leave of absence, pursuant to Article 23.1(D)(4) of the CBA. Prior to sending the letter, however, Gawne contacted Hudson's unit--the 18th District--and instructed them to submit a PAR form for each day Hudson was absent. After Gawne received a memorandum and four PAR forms from the Commander of the 18th District, he prepared and sent the letter of termination to Hudson. This letter stated that Hudson had been absent for four consecutive days without authorization and without notice to his employer. The CPD considers terminations pursuant to this policy to constitute a "resignation."

Upon receiving the termination letter, Hudson paged Gawne. When Gawne called Hudson back, Hudson told him that there had been a mistake. Gawne suggested that Hudson contact his commander and specify the mistake. Gawne was concerned that there might have been a miscalculation regarding Hudson's AWOP days. Hudson then contacted his district on or about March 26, 2001. He met with his commander, Joseph Griffin, about his termination status. Griffin advised Hudson to write a memorandum to support his contention that his termination was a mistake.

On April 11, 2001, Hudson submitted a written memorandum stating why he believed he was not AWOP for four consecutive days. He also requested a hearing and/or evaluation of

-8-

incident. According to the City, this information was reviewed and investigated by CPD; it determined that there was not sufficient basis in Hudson's submission to substantiate his claim that he had not been absent without notice. Hudson disputes that the City reviewed and investigated this information and relies on the CPD policy, which does not include provisions allowing an officer an opportunity to be heard regarding his reason for absence. However, after Hudson submitted his April 22 memo, Commander Powers, the Commander of Personnel since February 1, 2000, read the memo and sent Hudson a letter on June 8, 2001 that indicated that the CPD would not change its decision to terminate him. The letter also indicated that Hudson could provide additional information if he wished. Powers' action was not pursuant to any CPD policy, but was an offer that he made on his own.

Shortly after Powers' June 8, 2001 letter, he received a letter from attorney Tamara Cummings, who purported to represent Hudson. In the letter, Cummings requested reinstatement on Hudson's behalf. On July 9, 2001, Powers replied, stating that he would not change the City's position regarding Hudson's termination. Hudson never submitted any additional information.

**Pamon's Work History as a Chicago Police Officer**

The City hired Pamon on December 22, 1986 as a probationary police officer. Pamon was still working for the CPD in 2002. At the time of his termination on February 20, 2002, Pamon was working at the 21st District of the CPD.

The CPD arranges for police officers to take vacation, which are called "furlough" in the CPD, during spans of time called periods. Police officers must bid in advance for the period that they wish to use their furlough time. Police officers bid for furlough by completing a form entitled, "Furlough selection request." While police officers may seek

to extend a furlough, the CPD is not obligated to grant an extension. Requests for extension must be approved by a police officer's superior officer.

Officers bid for their furloughs in the fall. In the fall of 2001, Pamon had 25 days of authorized furlough. On or about November 16, 2001, Pamon requested to take furlough during the month of January 2002, the first period. Additionally, Pamon requested a furlough extension for the entire second period which ran until February 26, 2002. For furlough extensions, officers may use any time they have available, including time due or baby furlough. Pamon had enough accumulated time to request a furlough extension through February 26, 2002.

On December 28, 2001, which was the last day Pamon worked before starting his furlough, he requested the furlough extension by submitting his furlough request sheet along with the associated time due slips that would carry him through February 26, 2002. Pamon left these forms in his supervising sergeant's in-basket; he did not speak with anyone to determine whether his request for extension had been approved. In his 15 years of police experience, however, Pamon always submitted his furlough extension requests in this manner and he was always approved. Further, he was never notified that they were approved; rather, he merely returned to work on the date he had specified on the furlough selection paperwork.

Pamon's watch commander, Captain Eugene Roy ("Roy"), denied Pamon's February 2002 furlough extension because Pamon failed to comply with the CPD's procedures for obtaining an extension. Roy informed Pamon of the denial in a letter dated January 28, 2002 that was sent to the address Pamon listed as his home address to the CPD. However, Pamon had moved from that address since the summer of 2001, and he had neglected to update his

home address with the CPD. Thus, he was not aware that the CPD had sent him letters or that they had been looking for him until he returned from his trip. (During the time he was on furlough, Pamon was traveling to and from the Birmingham, Alabama area.)

## Pamon's Termination

On February 1, 2002, Pamon's furlough ended. Pamon's watch commander did not take immediate action on Pamon's status; he ordered several members of Pamon's district to attempt to discern Pamon's whereabouts. Unable to find or communicate with Pamon, Pamon's watch commander ordered that Pamon be noted as absent without notice on February 13, 2002. Pamon did not come to work and was noted as absent without notice on February 13, 14, 15, and 19. In accordance with CPD procedure, the 21st district filled out PAR forms for each day that Pamon was absent.

Pamon did not contact anyone at the CPD until February 25, 2002. He spoke to Roy and indicated that he would come into the 21st District the next day to discuss his status. On February 26, 2002, Pamon met with Roy and the desk sergeant, Sergeant Rigo. Roy told Pamon that he (Roy) had been on vacation, and that nobody else had acted on Pamon's furlough extension request forms. Roy explained that Pamon had been absent without notice for more than four days and efforts had been made to reach him to find out why he needed to extend his furlough for that particular length of time. Pamon requested the extended furlough due to illnesses that his godmother and his girlfriend were suffering, as well as an IRS problem. Pamon did not tell Roy his reasons other than making vague references to "medical situations with my girlfriend and godmother" because he did not want everyone at the station to know about his personal matters. Roy was apologetic and told Pamon that he "did what he

-11-

had to do" and that he knew that Pamon was a good police officer. Pamon responded that he believed that anything done could be undone and that he wanted his job back.

Shortly after this meeting, Powers sent Pamon a letter advising him that his employment was being terminated for unauthorized leave of absence pursuant to Article 23.1(D)(4) of the CBA. The letter stated Pamon had been absent for four consecutive days without authorization and without notice to his employer.

Within a week or ten days after his meeting with Roy and Rigo, Pamon met with Jim O'Leary ("O'Leary"), an officer of the Union. O'Leary indicated that the Union could not proceed on Pamon's behalf because the job abandonment policy was a contractual provision to which they had agreed. He indicated that he would take the matter to the entire board and get back to him. Sometime thereafter, Pamon called O'Leary and was informed that the Union would not proceed on his behalf.

## III. Discussion

The City moves this Court to enter summary judgment in its favor on Counts II and III of the First Amended Complaint.[3] Both Counts are procedural due process claims because Plaintiffs allege that Defendant terminated Plaintiffs from their employment without due process of law. The Fourteenth Amendment Due Process Clause forbids a state from depriving any person of life, liberty, or property without due process of law. A procedural due process claim is a two-step analysis: (1) whether Defendant deprived Plaintiffs of a constitutionally protected property interest; and (2) if so, whether that deprivation occurred without due process of law.

---

[3] Upon stipulation by the parties pursuant to Fed. R. Civ. P. 41(a)(1), the Court dismissed Count I of the First Amended Complaint without prejudice on October 3, 2002.

Doe v. Heck, 327 F.3d 492, 526 (7th Cir. 2003) (citing Zinermon v. Burch, 494 U.S. 113, 125 (1990)).

Thus, to state a federal procedural due process claim, Plaintiffs must demonstrate: (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process. Licari v. City of Chicago, 298 F.3d 664, 668 (7th Cir. 2002). The City argues that summary judgment should be granted because Plaintiffs have not established a constitutionally protected property interest in their continued employment. The City argues alternatively that, even if Plaintiffs establish a property interest, they were not deprived of that interest without due process. This Court addresses the City's arguments in turn.

### A. Plaintiffs' Protected Property Interest

For Plaintiffs to proceed with their claims, "[t]he threshold question is whether a property interest actually exists." Buttitta v. City of Chicago, 9 F.3d 1198, 1201 (7th Cir. 1993). A property interest in employment can be created and "defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). For example, property interests in employment may be created by express or implied contracts, municipal ordinances or state laws, including those "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.

Defendant argues that Plaintiffs have not articulated a basis for a constitutionally protected property interest to continued employment at the CPD. The Illinois Municipal Code, however, which was adopted by the City pursuant to its home rule powers, provides in pertinent part that:

-13-

> In any municipality of more than 500,000 population, no officer or employee of
> the police department in the classified civil service of the municipality whose
> appointment has become complete may be removed or discharged, or suspended
> for more than 30 days, except for cause upon written charges and after an
> opportunity to be heard in his own defense by the Police Board . . . .

65 ILCS 5/10-1-18.1.

Neither party disputes that both Hudson and Pamon were appointed, nonprobationary officers at the time of their discharge. Therefore, by virtue of their employment and under Illinois law, the Court finds Plaintiffs have a protected property interest in their employment with the CPD. See also Confederation of Police v. City of Chicago, 547 F.2d 375 (7th Cir. 1977) (holding that, under 65 ILCS 5/10-1-18.1, a police officer's property interest does not extend to conditions fo employment, it is limited to protection from discharge or suspension); D'Acquisito v. Washington, 640 F. Supp. 594, 607 (N.D. Ill. 1986) (finding that section 10-1-18.1 creates a property interest in continued employment for Chicago police officers)..

B. Deprivation without Due Process

Once Plaintiffs demonstrate that they have a constitutionally protected property interest, they must then show that the City deprived them of that interest without due process of law. Defendant first argues that it did not deprive them of their property interest in continued employment in the CPD because Plaintiffs abandoned their jobs and thus constructively resigned from their employment. Second, Defendant argues that, even if Plaintiffs did not resign, they received adequate due process prior to their termination. The Court addresses each argument in turn.

## 1. Job Abandonment and Constructive Resignation

It is axiomatic that, if an employee voluntarily resigned from his employment, he relinquished rather than was deprived of his property interest in continued employment. Further, in some circumstances, an employee may constructively resign when he "abandons (without formally resigning) his job and his employer treats the employee as if he had formally resigned." Patterson v. Portch, 853 F.2d 1399, 1406 (7th Cir. 1988); see also Lindsey v. Baxter Healthcare Corp., 962 F.2d 586, 588 (7th Cir. 1992) (commenting that "[c]onstructive resignation is a useful, or at least harmless, legal fiction").

Defendants argue that the CBA contemplates constructive resignation through job abandonment with its AWOP policy. Article 23.1(D)(4) states in pertinent part that "the employment relationship [of an officer] shall be terminated in the following circumstance[]: . . . Unauthorized absence for four (4) consecutive working days without notice to the Employer." Article 23.1(D)(4), however, is just one of several circumstances that lead to an officer's termination; indeed, both resignation and separation (discharge) are listed in that provision as well. Thus, contrary to Defendant's contention, Article 23.1(D)(4) does not conclusively demonstrate Plaintiffs resigned from their jobs by going AWOP. As the Patterson court cautioned, "[constructive resignation] is not a talisman," 853 F.2d at 1406, and it is just as likely that 23.1(D)(4) merely provides a reason for terminating Plaintiffs.

Further, this Court notes that this is not a case "where a worker tells his employer that he won't do any work, but that he won't quit either." Lindsey, 962 F.2d at 588; see also Dies v. City & Council of Denver, 483 P.2d 378 (Colo. 1971) cited in Patterson, 853 F.2d at 1406 (holding that, a police officer who had been recalled to serve in the Korean War but who had

-15-

voluntarily remained in military service for seven years afterward, constructively resigned from the police force). In this case, neither Hudson nor Pamon intended to relinquish their employment by refusing to work. Hudson, who was not able to exercise his police powers or be in a paid status while subject to a judicial restriction from using a firearm, attempted to contact his district commander when he exhausted all of his accumulated personal time. Indeed, he had gone so far as to schedule a meeting with him to discuss what course of action he needed to take next. Similarly, Pamon did not simply refuse to show up to work. Because he had submitted a furlough extension, which was done in the same way that had been approved in his 15 years of experience, he was not aware that he was AWOP at all. Thus, because this Court finds that neither Hudson's nor Pamon's absences evince an intent to refuse to work, Defendant cannot claim that they constructively resigned.

## 2. Due Process

Now that Plaintiffs have demonstrated that they were deprived, rather than relinquished, their constitutionally protected property interest in continued employment, their final step is to show that they were not afforded due process before this deprivation.[4]

---

[4] Plaintiffs primarily argue that they were terminated without due process because they did not receive the procedural protections that the Illinois Municipal Code provides. However, "failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process." Martin v. Shawano-Gresham Sch. Dist., 295 F.3d 701, 706-07 (7th Cir. 2002). See also Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Ind., 57 F.3d 505, 514 (7th Cir. 1995) (holding that a violation of state procedural statute does not violated the Constitution); Wallace v. Tilley, 41 F.3d 296, 301 (7th Cir. 1994) (same). Thus, contrary to Plaintiffs' contention, they do not have a constitutional right to any particular type of procedures; rather, the Defendant is only required to provide Plaintiffs the minimum due process rights guaranteed by the Constitution.

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Due process, however, "is not a 'technical conception with a fixed content unrelated to time, place and circumstances'. . . [;] [t]hus, the precise form and extent of process required in a particular situation will vary from other factual situations." Alexander v. Wisconsin Dept. of Health and Family Servs., 263 F.3d 673, 688 (7th Cir. 2001) (citing Mathews, 424 U.S. at 332)).

Generally, some form of pre-deprivation notice and hearing is required before a public employee with a property interest in his job may be discharged. Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 547 (1985). The Supreme Court, however, "[s]tress[ed] that the pretermination hearing 'should be an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action,' [so] that the pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." Gilbert v. Homar, 520 U.S. 924, 929 (1997) (citing Loudermill, 470 U.S. at 545-46). Further, in instances where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. Id. at 930 (collecting cases).

To determine what process is due in any particular set of circumstances, courts must balance: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any,

-17-

of additional or substitute procedural safeguards; and (3) the City's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335.

Applying this balancing test to the facts of this case, the Court finds that the City satisfied the Constitution's due process requirements. Although the Plaintiffs' private interest--retaining their employment--is significant, see Loudermill, 470 U.S. at 543 ("[T]he significance of the private interest in retaining employment cannot be gainsaid."), the risk of erroneous deprivation through the City's procedures is fairly low. Further, additional or substitute procedural requirements not only would be unduly burdensome but they are unnecessary. First and most importantly, the City gives notice to its employees through its AWOP policy that officers will be terminated should they be absent without authorization for four consecutive days. Second, inherent in the City's policy is a system of checks and balances to help ensure that officers will not be terminated erroneously under this AWOP policy. For example, in this case, after both Hudson and Pamon were AWOP for the requisite four consecutive days, their units were required to fill out PAR forms on them and forward them to Personnel. Once Personnel received all of the PAR forms, an administrative sergeant independently verified that there was a four-day AWOP by calling each officer's unit. Only upon verification that the officer indeed was absent four consecutive days without permission, did the Commander of Personnel sign off on the final PAR forms, thus executing the officers' terminations.

As the purpose of pretermination procedures is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the

-18-

proposed action," this Court finds that the City's pretermination process regarding the AWOP policy adequately does just that.

Further, through the CBA, the City has post-deprivation procedures available that Plaintiffs could have utilized. Namely, the CBA outlines a substantial grievance procedure, which includes opportunities for mediation and/or arbitration if the employee is dissatisfied with the result. The Seventh Circuit has held that grievance procedures created by collective bargaining agreements can satisfy the requirements of due process for terminated employees. See, e.g., Buttitta v. Chicago, 9 F.3d 1198, 1206 (7th Cir. 1993) (holding that post-deprivation grievance procedure available to Chicago police officers under their collective bargaining agreement satisfied due process requirements for officers seeking to establish their medical fitness to return to duty); Winston v. United States Postal Serv., 585 F.2d 198, 209-210 (7th Cir. 1978) (holding that the 3-step grievance procedure provided in the collective bargaining agreement for postal workers satisfied procedural due process requirements). Neither Hudson nor Pamon initiated the grievance procedures by filing a grievance. That Plaintiffs did not take advantage of the post-deprivation procedures Defendant provided is of no moment; "a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982).[5] Because this Court finds

_____

[5] Plaintiffs' contention that the grievance procedure in the CBA is inadequate because they were told that they could not initiate a grievance on their own and their union refused to initiate one on their behalf is unpersuasive. First, the plain language of the CBA states: "A grievance may be initiated by the [Union] or an aggrieved officer." Second, a union's failure to act on an employee member's behalf does not constitute a due process violation by the employer because the employee can sue the union for breach of duty of fair representation.

that the City's pretermination procedure regarding the AWOP policy, coupled with the grievance procedures in the CBA, satisfied the Due Process Clause of the Constitution, summary judgment is granted in favor of the City on Counts II and III (the remaining counts) of the First Amended Complaint.

### III. Conclusion

For the foregoing reasons, this Court GRANTS Defendant City of Chicago's motions for summary judgment in their entirety. This case is closed.

Enter:

**David H. Coar**
**United States District Judge**

**Dated: May 28, 2002**

Winston, 585 F.2d at 209.